## THE SEEANDBEE.
### No. 7712.

Circuit Court of Appeals, Sixth Circuit.
March 17, 1939.

James M. McSweeney and W. K. Gardner, both of Cleveland, Ohio, for appellant.

Russell V. Bleecker and Theo. C. Robinson, both of Cleveland, Ohio, for appellee.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

This is an appeal from a decree in favor of respondent-appellee in a suit in admiralty instituted against it to recover damages on account of personal injuries. The steamer was a merchant vessel of more than twenty tons burden, engaged in commerce and navigation upon the Great Lakes. Libellant was employed on it as a water tender and while so engaged in the boiler room slipped and fell against a moving part of the air pump and his right hand was caught and severely mangled by reason of which injuries it became necessary to remove the index and middle fingers and part of the palm of his right hand.

He alleged that his injuries were caused from the unseaworthiness of the vessel in two particulars, (1) the floor in the boiler room on which the air pumps rested was defective and yielded under his weight and by reason of oil and grease thereon precipitated him against the air pump; (2) there were no guards, rails, barriers or other safety devices around the air pump and that it was located in close proximity to a narrow and dangerous passageway which libellant was required to use in the performance of his duty.

The Seeandbee was built in 1913 and libellant, who had been a seaman since 1903, had worked on it for twenty years. At the time of his injuries his duties were to keep water in the boiler, take care of the water pumps, operate the ash pan, pump the ashes out for the coal passers and assist the engineer when needed.

The Seeandbee had three pumps located in the pump or fan room on the lower deck with the boiler room just below the main engine room on the starboard side. The pump on which libellant was injured was a Knowles vacuum pump used to remove steam from the main turbines of the engine and pump the condensation over the side. It contained rapidly moving pistons, rods, parts and attachments. Immediately opposite this air pump was an inclosed fan with a guard rail entirely around it with a passageway of forty inches between and in the course of libellant's duty as water tender, he walked through this passageway.

The pump had a hydrostat lubricator on it and the oil was pumped in by working a plunger. The oil was put into the oil container by taking the plug off the top of the lubricator, shutting off the steam valves and pouring it in from a can. Underneath the piston rod there was a trough to catch the condensation from the steam end and the water from the water end and underneath this, there was a pan fastened directly to the floor plates about eighteen inches wide, three and a half feet long and about an inch and a half in depth and the water and oil from the first trough passed into the lower pan from a hole in the bottom of the top trough, which at times became clogged. The piston rod in the pump worked forward and backward full stroke with a tappet arm that tripped the valve to emit the steam. The packing of the pump frequently became loose which would cause the piston to take a half stroke until it was again tightened. The injectors were in the back of the pump and in order to start them it was necessary to go through the passageway between the fan and pump.

Libellant testified that on July 30, 1935, at 3:30 A. M., while on duty as a water tender, he went to the starboard side of the pump where he noticed that the pan on the floor underneath the pump was full of water and oil and that the oil drain underneath the pump was stopped up and the trough filled and he put his hand in and undertook to open it but the drain pipe was clogged with dirt which he could not clear by pushing his finger up through it. He said when it stopped up in that manner the oil and water would seep onto the floor and that on this particular day there was oil and water in the passageway between the fan and pumps; that after he failed to remedy the stoppage he started around to the port side of the pump through the narrow passage between the fan and the pump on his way to the boiler room, the floor seemed to give a little, he lost his balance and fell against the pump, caught his right hand in the moving parts and it was crushed and mangled.

No one saw the accident and libellant was the only witness who testified to the circumstances under which the injury occurred. George Turnbull, chief engineer, at the time of the accident and at the time

580

of the trial, testified that libellant told him he was on the starboard side stooping down "cleaning out the hole underneath the pump; that the ship gave a jerk and he slipped with his hand out and his other hand underneath the pump." Libellant denied he told Turnbull he was injured while attempting to unstop the drain pipe. This witness, on cross-examination, said that Arriaga told him "before he was injured" he was trying to loosen up the drain hold but at the time of the accident was on the port side. Turnbull also testified that immediately after the accident the floor around the pump was wet and that it was usually wet. He further testified that it was not the duty of the water tenders to adjust the pumps but they should notify the boiler room engineer of any defects.

John Dwyer, the boiler room engineer, who had charge of the pumps, testified that it was part of the duty of the water tenders to oil the pumps and when any adjustments were to be made he or the engineer on watch should be notified but they sometimes adjusted the pumps when trouble arose and that he knew they did and permitted them to do so. Several of the witnesses testified that after the accident, as soon as the steamer reached Cleveland, a guard rail was placed on the port side of the pump.

On the foregoing facts the lower court found there was no substantial evidence showing unseaworthiness of the vessel on account of defective floor plates yielding under pressure or because of the presence of oil, water or grease on the floor at the pump. It found there was unseaworthiness because of the absence of guard rails or barriers around the pump on the port side which was located adjacent to a narrow passageway between the fan and the pump. It further found that employees in the course of their duties in using the narrow passageway passed close to the unguarded moving parts of the pump, and that the absence of a guard around the pump was not the proximate cause of libellant's injuries.

■ The evidence is conflicting as to the condition of the floor plates, the amount of oil, water and grease thereon adjacent to the pump at the time the libellant was injured. Under such circumstances the findings of the District Judge who heard and saw the witnesses will be accepted.

The William A. Paine, Pioneer S. S. Co. v. Deming, 6 Cir., 39 F.2d 586.

On the second ground of alleged unseaworthiness, the lower court found that libellant was contradicted in his testimony by a statement he had theretofore made to the steamer's chief engineer, Turnbull, that he was cleaning out the drain and and in a stooping position on the starboard side of the pump, and there was a jerk or roll of the ship which threw him off balance and into the pump and that this was evidence of substance.

Libellant on the trial testified that immediately before his injury he was on the starboard side of the pump endeavoring to free the drain which he was unable to do, and that he walked to the port side and slipped on the wet, oily floor and fell into the pump.

The lower court concluded from this testimony that libellant was unworthy of belief and that there was no substantial evidence of his injury being due to the unseaworthiness of the vessel because of the absence of guard rails around the pump. In other words, the court assumed that the libellant had given two accounts as to how his injury occurred which were contradictory and that he could recover on one only; that it was not required to choose between the two but could simply set them against each other, perceiving that both could not be correct, and therefore concluded that libellant had erred in one or the other without determining which.

The rule applied by the lower court has its place in the law of evidence in the interest of truth. However, it should not be used to defeat justice and has its limitations. It is inapplicable to the facts in this case. The testimony shows, without contradiction, that libellant's right hand was injured by coming into contact with the moving parts of the pump. It further shows that the accident could not have happened if libellant had been on the starboard side in the position the witness, Turnbull, testified he had told him.

The evidence also shows that libellant was a native of France, had an imperfect knowledge of the English language and spoke it brokenly and indistinctly. He testified that immediately before the accident he had been on the starboard side of the pump and attempted to unstop the drain pipe without success and walked from that side to the port side when he

slipped and fell. This probably accounts for the seeming conflict with the statement made to Turnbull.

The witness, Turnbull, was not entirely disinterested. He ·was the chief engineer of the boat and responsible for its safe operation. His testimony was not free from contradiction and ambiguities. He admitted on cross-examination that libellant told him he was on the port side at the time he fell into the pump. The Indien, 9 Cir., 71 F.2d 752.

■ A party to a civil suit may sometimes be estopped by reason of statements made in pleadings or a previous judgment on the same subject matter or conduct in litigation by which others have been misled, but a litigant, if allowed to testify at all, is not estopped by previous contrary statements even if under oath. Such statements are admissible to affect his credibility but not to destroy his evidence. Southern Transportation Co. v. Ashford, 5 Cir., 48 F.2d 191.

■ Inconsistencies and incongruities in the testimony of witnesses whose general character for veracity has not been attacked should be reconciled when possible, especially when there is no extrinsic reason for suspecting error or fraud. If the testimony is irreconcilable, the presumption of reason as well as law, will impute the variance to an innocent misconception rather than to a wilful and corrupt misrepresentation. Staples v. Continental Insurance Company of New York, 223 Ky. 842, 5 S.W.2d 265.

■ Where there is a seeming conflict of evidence, it is the duty of the trial court in non-jury cases to scrutinize it strictly in order to ascertain whether it is susceptible of explanation or incapable of being reconciled. The matter to be determined is whether one fact testified to by a witness is wholly inconsistent with the other and after this is ascertained, if irreconcilable, the court is authorized to determine who spoke truthfully or if the conflict arises from the inconsistency of a party to the litigation, the court may determine that he has failed to carry the burden of proof imposed on him. Louie Poy Hok v. Nagle, 9 Cir., 48 F.2d 753; Ariasi v. Orient Ins. Co. et al., 9 Cir., 50 F.2d 548.

■ In determining whether libellant's injuries were due to the unseaworthiness of the ship, it was the duty of the trial court to take into account the fact and nature of the accident in connection with all other circumstances in the case, notwithstanding negligence is not ordinarily assumed from the mere fact of accident. This the court did not do. Globe S. S. Company v. Moss, 6 Cir., 245 F. 54, 58.

■ The decree of a District Court in admiralty is vacated on appeal and the hearing in the Circuit Court of Appeals is in the nature of a trial de novo. In such proceedings the findings of the District Court upon controverted questions of fact will stand unless clearly against the weight of the evidence. Brooklyn Eastern District Terminal v. United States, 287 U.S. 170, 177, 53 S.Ct. 103, 77 L.Ed. 240. The appellate court, however, has the final responsibility for the facts as well as the law and findings of the District Court will not stand where it proceeded on an erroneous application of a rule of evidence which leads it to an incorrect conclusion or its findings of fact are contrary to the clear weight of the evidence. The Ernest H. Meyer, 9 Cir., 84 F.2d 496.

■ It is the duty of a shipowner or master to supply a seaworthy vessel for its employees and this does not depend on the exercise of reasonable care, but is absolute. The H. A. Scandrett, 2 Cir., 87 F.2d 708. A seaman does not assume the risk of injury even from obvious dangers if the proximate cause thereof is the failure of the shipowner or master to supply and keep in order proper appliances appurtenant to the ship and the same rule applies for failure to provide a safe place in which to work. Cleveland Cliffs Iron Company v. Martini, 6 Cir., 96 F.2d 632; Socony-Vacuum Oil Company v. Smith, 305 U.S. 424, 59 S.Ct. 262.

■ The uncontroverted evidence in the case at bar shows that the pump with its rapidly moving and unguarded parts was located on one side of a narrow passageway directly opposite a guarded revolving fan and further shows that had the pump been guarded the libellant would not have fallen into it. This constituted an unsafe place in which to work and made the ship unseaworthy, and was the proximate cause of his injury.

■ The libellant knew the pump was unguarded and that the floor around it and in the passageway was wet and oily. The rule of assumed risk or contributory neg-

582

ligence must be applied in admiralty under the doctrine of comparative negligence and neither is a bar to recovery but can be invoked only for the purpose of mitigating damages. Socony-Vacuum Oil Company v. Smith, supra.

We must make such disposition of the case as the record before us shows to be proper. At the time of his injury, libellant was forty-five years of age, in good health and earning $100.00 per month as an employee on the steamer and had spent his entire adult life working on the same ship. His injuries incapacitated him from again resuming the occupation of a seaman. Considering all the facts of the case including the age of libellant, his life expectancy, state of health and earning capacity and the circumstances under which he was injured, we are of the opinion his damages are, and they are hereby fixed at, the aggregate sum of $3,-500.00.

The decree of the District Court is reversed and the cause remanded with directions to the court below to award libellant, John Arriaga, Thirty-Five Hundred ($3,-500.00) Dollars and his costs.