## The JOSEPHINE & MARY.

### LOIACANO v. OIL SCREW SCHOONER JOSEPHINE & MARY et al.

#### No. 3633.

Circuit Court of Appeals, First Circuit.
June 11, 1941.

Reuben Goodman, of Boston, Mass. (Peter C. Borre, of Boston, Mass., on the brief), for appellant.

J. M. Marshall, of Gloucester, Mass., for appellee United Fisheries Co. and others.

Charles S. Bolster, of Boston, Mass. (Bingham, Dana & Gould, of Boston, Mass., on the brief), for appellee Pier Mach. Co.

Before MAGRUDER and MAHONEY, Circuit Judges, and HARTIGAN, District Judge.

HARTIGAN, District Judge.

This is an appeal of Salvatore Loiacano, p.p.a., one of the intervening petitioners, from the final decree and order for distribution entered in the District Court for the District of Massachusetts on July 19, 1940.

The vessel Josephine & Mary is a two masted fishing vessel and was owned of record by Joseph Pallazolo, who was also the master of the vessel. She was built, however, for Pallazolo and his brother-in-law, Jerome Loiacano, to whom Pallazolo referred as his partner, and who had a half interest in and sailed on the vessel, and shared equally with Pallazolo in the earnings of the vessel.

The vessel was employed a part of the year in seining and a part in dragging, with a crew of ten including the master, and was operated on a form of Italian lay, under which the crew were not charged with any of the expenses of the trips of the vessel. All of the expenses of a trip

were deducted from the proceeds of the sale of the catch of the trip, called the "gross stock," and the balance was distributed in the proportions of one share to each member of the crew for their services, and six shares to the owners for the vessel.

Salvatore Loiacano is the son of Jerome Loiacano and a nephew of Pallazolo. He began to go fishing when he was fourteen years old, and worked aboard the Josephine & Mary for three years previous to his injury on January 10, 1937, the first two years as assistant engineer and the last year as engineer. He was the engineer at the time of his injury and was then about seventeen and a half years of age.

The morning of January 10, 1937, the vessel was dragging and proceeding under power with the riding sail set, about one hundred ten miles off shore from Phoebus, Virginia, where the catch was landed. Salvatore was in the engine room and had finished some work on the fuel checks when he noticed a water leak in the air compressor, situated in the wing of the vessel on the starboard side, two or three feet from and connected with the engine by three belts. He said he reported the leak to Pallazolo and told him that he would wait until the engine was stopped and then fix it, but was told that he would better "do it now," and he was on his knees, with the engine running and the boat moving and tossing, tightening the place of the leak with a wrench, and had it almost tight when his head was caught or struck by the governor on the engine and was badly injured.

He came on deck with his scalp torn and bleeding and Pallazolo attended him and they started for shore where he was taken to the Soldiers Hospital at Fortress Monroe, and then to the Dixie Hospital at Hampton, nearby. They did what they could for him there, after which he was brought home for further treatment.

On the return of the vessel to Gloucester the last of March or the first of April, 1937, Pallazolo made an oral agreement with Salvatore's father and mother, at their home, to pay for Salvatore one share out of the owners' six shares of the net proceeds of the trips of the vessel, and his hospital and medical expenses, until he was well and able to work.

After Salvatore's return home and up to May 10, 1939, he underwent five operations and he received considerable medical and hospital care.

It was Pallazolo's practice as master of the vessel to distribute the net proceeds of the catch of the trips at the end of each trip. He said he paid Salvatore's parents one full share, in accordance with the agreement, during 1937, and after that half a share, and in addition paid his hospital and medical expenses, all out of the owners' shares. The change to half a share he said he made because he thought it would enable him to pay "more of the bills," but what Salvatore did not get he "had coming" and that there were some bills for hospital and medical expenses remaining unpaid.

Medical testimony disclosed that Salvatore's condition and inability to work were permanent.

Salvatore's amended petition is described as for a "cause of contract for settlement of personal injuries and for maintenance and cure, civil and maritime."

The petition alleges that his injuries were "caused by the negligence of the owners, agents or servants of the vessel," recites the agreement made by Pallazolo with his parents, and alleges that they received as payment thereunder for his medical expenses various sums aggregating approximately $3,000 and one share of the net proceeds of the catch of the trips in 1937, but thereafter only half a share to December 2, 1939, which is the date of the filing of the libel in this cause.

The petitioner further alleges that the value of one share agreed upon was $1,200 per annum "plus found with a value of $500 per annum," and that there is due him one-half such a share for 1938, in the amount of $850, and one-half such a share for 1939, to and including December 2 in the amount of $800, also for medical expenses remaining unpaid for 1938, in the amount of $400, and for 1939, in the amount of $500, and that there is also due him further sums at the rate of $1,700 a year from December 2, 1939, for a period of years he will be unable to work because of his injury, and for the expense of the continuance of his medical treatment.

The proctor for Salvatore rested his case on the amended petition in contract. He referred to the "background" of the case as a maritime tort for which the vessel was liable on which a suit might have been brought, and contended in substance that the agreement made for Salvatore's benefit

was likewise maritime in nature, that he did not lose his lien on the vessel by the agreement and that he was entitled to further payments for "maintenance and cure."

That Salvatore was badly injured and that the agreement for his benefit was made as alleged were not disputed.

The contestants contended in substance that even if there may have been a liability in tort, which they do not admit, the agreement was not a maritime contract, and in any event was not a contract for the enforcement of which there was a lien on the vessel. They did not dispute that the petitioner was entitled to maintenance and cure for his injury, but questioned whether he was entitled to any further payments therefor.

The vessel was sold on order of the court and the proceeds of the sale, in the amount of $12,094.94, deposited in the registry of the court.

Salvatore's claim raises the questions whether the agreement made for his benefit may be enforced against the fund in the registry, and what, if any, further payments may be allowed him for maintenance and cure.

Certain contract maritime lien claims had accrued against the vessel prior to Salvatore's injury on January 10, 1937, and other contract maritime lien claims accrued against the vessel after his injury.

The Commissioner found that Salvatore was given prompt medical attention when he was hurt and there was no failure to care for him and treat his hurt; that there was no defect in the machinery or in the place where the accident occurred; that he was unable to find on the evidence that the absence of a covering made the governor or engine on the vesesl in this case defective. He also found that "The only element of unsafety or danger in the place of the accident was in working there when the engine was running, of which Salvatore was well aware, and he said that they never worked there 'with the engine going'." He found that the instant case is distinguished from The Seeandbee, 6 Cir., 102 F.2d 577, 1939 A.M.C. 711, which was cited on Salvatore's behalf, for in that case the floor of the narrow passage through which the seaman had to pass in the performance of his duties, and where he was injured, was wet and slippery with oil and water which seeped upon the floor.

The Commissioner further stated "It seems to me that the issue in the cause is merely that of an improvident or negligent order of the master in the operation of the vessel, for which, under the maritime law, there is no right of indemnity against the owner, or lien on the vessel," citing The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760, and Chelentis v. Luckenbach S. S. Co., 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171.

The Commissioner in this cause found and ruled that Salvatore had no claim against the vessel or owner under the maritime law. He also found that Salvatore's petition is not brought in tort, but in contract on the agreement and that the agreement is not a maritime contract or a contract for the performance of which there was a lien on the vessel.

The Commissioner further stated,

"The agreement is not concerned with the use or operation of the vessel as an instrument of navigation or commerce, nor does it bind the vessel, and I find and rule that the petitioner did not have a lien on the vessel for the enforcement of the agreement, and is not entitled to share in the fund in the registry thereunder with the lien claimants, and that his claim in contract should be disallowed.

"Salvatore was grievously injured, but his rights arise under the Jones or Seamen's Act, [46 U.S.C.A. § 688] or under the common law, not in admiralty—except as to 'maintenance and cure'."

Salvatore claimed that he is entitled to maintenance and cure for three years from 1939, at $2,000 a year. The Commissioner disallowed this claim on the authority of Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 531, 58 S.Ct. 651, 655, 82 L.Ed. 993, in which the court said:

"The seaman's recovery must therefore be measured in each case by the reasonable cost of that maintenance and cure to which he is entitled at the time of trial, including, in the discretion of the court, such amounts as may be needful in the immediate future for the maintenance and cure of a kind and for a period which can be definitely ascertained."

The Commissioner found doctor's bills amounting to $442, which the owners have not paid, may be collected by Salvatore from the fund in the registry, and that he is also entitled to receive from the fund the expenses for hospital, medical services,

and the like, amounting to $193, which he has incurred, a total of $635, for such expenses which may be allowed and paid him out of the fund.

The Commissioner in his report stated:

"Whether Salvatore is entitled to any further allowance is a difficult question. It appears that there is nothing further that medical science can do to effect a cure. His wound will have to be attended to and his condition checked from time to time, for how long I have no means of determining, but such attention would not seem to be expensive. I think, however, that he is entitled to a further payment at this time for his needs, and that considering all the circumstances the sum of $500 may be allowed him.

"I accordingly find and rule that Salvatore is entitled to share in the fund in the registry for maintenance and cure in the amount of $1135."

The Commissioner also ruled that the claim of Salvatore Loiacano amounting to $1,135 for expenses of maintenance and cure, and the claim of Old Point Fish Company for $201 paid by it to the Dixie Hospital should be paid first; and thereafter the other claims allowed, in the inverse order of the years in which they accrued.

Salvatore's parents had been paid previously under the agreement which they had made with Pallazolo, the master and record title holder of the vessel, approximately $5,400.

On May 10, 1940, Salvatore Loiacano filed objections to the Commissioner's report especially as to the Commissioner's finding that there was no defect in the machinery or the place where the accident occurred. Salvatore contended that the place where he performed his work was unsafe and dangerous and that the agreement and all the circumstances surrounding the injury received by Salvatore and the ensuing agreement are definitely in the nature of a maritime lien. He also objected to the amount of $500, as found by the Commissioner, for further allowance for "maintenance and cure" as being insufficient.

On June 10, 1940, the report of the Commissioner was confirmed by the District Court.

On June 29, 1940, Salvatore Loiacano filed a motion to amend his intervening petition by inserting in it the following:

"Second Cause of action—Unseaworthiness by Reason of Defective Equipment Under the General Admiralty Law."

On July 16, 1940, the District Court "Ordered that the amendment be allowed solely for the purpose of making the libel conform to the evidence adduced before the Commissioner, upon the understanding and stipulation that no further evidence is to be taken before the Commissioner because of the amendment."

On July 19, 1940, the District Court entered a final decree and order of distribution in accordance with the report of the Commissioner as confirmed by the court on June 10, 1940.

From the foregoing final decree and order of distribution, Salvatore Loiacano claimed an appeal to this court and filed the following as his assignment of errors:

"1. In failing to find that the place on the Oil Screw Sch. 'Josephine & Mary' where the accident to the intervening petitioner occurred, was dangerous and defective.

"2. In failing to find that the place on the Oil Screw Sch. 'Josephine & Mary' where the accident to the intervening petitioner occurred, was in consequence of unseaworthiness of the ship or failure to supply and keep in order the proper appliances appurtenant to the said Oil Screw Sch. 'Josephine & Mary'.

"3. In failing to find that the injury of the intervening petitioner which occurred on the Oil Screw Sch. 'Josephine & Mary' in consequence of unseaworthiness arose under circumstances, under Maritime Law, and that the intervening petitioner has a right of indemnity against the owner.

"4. In failing to find that the injury of the intervening petitioner which occurred on the Oil Screw Sch. 'Josephine & Mary' in consequence of unseaworthiness arose under circumstances, under Maritime Law, and that the intervening petitioner had a lien on the vessel.

"5. In failing to find that the subsequent action of the intervening petitioner did not in any way constitute under Maritime Law or under Admiralty Law a waiver or loss of the Maritime lien.

"6. In awarding an insufficient amount for maintenance and cure."

The Commissioner heard the testimony of the witnesses and had the opportunity not only of observing them but also of

judging their credibility and accuracy. His findings and rulings were fully recorded and have been confirmed by the District Court.

■ In The Parthian, C.C., D.Mass. 1891, 48 F. 564, the court said:

"It is the established rule of this court that it will not reverse the conclusion reached by the district court upon a controverted question of fact, where the evidence is contradictory, unless it clearly appears to be contrary to the preponderance of evidence." See also The City of Augusta, 1 Cir., 80 F. 297. The Lake Monroe, 1 Cir., 271 F. 474.

■ The Commissioner found that there was no defect in the machinery or in the place where the accident occurred and that the only element of unsafety or danger in the place of the accident was in working there when the engine was running, of which Salvatore was well aware.

In The Osceola, 189 U.S. 158, 23 S.Ct. 483, 484, 47 L.Ed. 760, the questions presented to the court were in substance: "whether the vessel was liable in rem to one of the crew by reason of the improvident and negligent order of the master in directing the hoisting of the gangway for the discharge of cargo, before the arrival of the vessel at her dock, and during a heavy wind." The court said, at page 175 of 189 U.S., at page 487 of 23 S.Ct., 47 L.Ed. 760:

"Upon a full review, however, of English and American authorities upon these questions, we think the law may be considered as settled upon the following propositions:

"1. That the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued.

"2. That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship. Scarff v. Metcalf, 107 N.Y. 211, 13 N.E. 796 [1 Am.St.Rep. 807].

"3. That all the members of the crew, except, perhaps, the master, are, as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew beyond the expense of their maintenance and cure.

"4. That the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew, but is entitled to maintenance and cure, whether the injuries were received by negligence or accident."

In the case of Chelentis v. Luckenbach S. S. Co., 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171, which was a suit brought by a fireman for injuries sustained by him at sea and in which he claimed that his injuries resulted from the negligence and an improvident order of a superior officer and for which he demanded full indemnity for damage sustained, the court said, at page 382 of 247 U.S., at page 503 of 38 S.Ct., 62 L.Ed. 1171:

"The work about which petitioner was engaged is maritime in its nature; his employment was a maritime contract; the injuries received were likewise maritime and the parties' rights and liabilities were matters clearly within the admiralty jurisdiction. Atlantic Transportation Co. v. Imbrovek, 234 U.S. 52, 59, 60, 34 S.Ct. 733, 58 L.Ed. 1208, 51 L.R.A.(N.S.) 1157. And unless in some way there was imposed upon the owners a liability different from that prescribed by maritime law, petitioner could properly demand only wages, maintenance and cure."

In the Chelentis case, the seaworthiness of the ship or appliances were not questioned, while in the instant case they are. However, the appellant has not called to our attention anything that warrants us in overruling the findings of the Commissioner on this issue. The Seeandbee, 6 Cir., 102 F.2d 577, 581, which is chiefly relied upon by appellant, is not in point. There the unguarded moving machinery was in close proximity to a passageway 40 inches wide through which the seaman had to walk in the regular course of his duties; the court was quite justified, therefore, in finding that this "constituted an unsafe place in which to work and made the ship unseaworthy." In the case at bar the unguarded moving parts were not in a place where they would be in danger of coming in contact with the seaman in the ordinary course of his duties. The seaman came in contact with the machinery only by stooping down, on his knees, to tighten up the air compressor with a wrench, and as the Commissioner pointed out, appellant him-

self testified that they never worked there "with the engine going." The mere fact that a seaman has been ordered to do a dangerous thing does not establish a case of unseaworthiness. Chelentis v. Luckenbach S. S. Co., supra. Under the circumstances we feel that the finding of the Commissioner on the issue of seaworthiness, which finding has been confirmed by the court below, should not be disturbed by us.

The appellant has not cited any authority that warrants us in holding that such an agreement as was made between the parents of Salvatore and the master of the vessel constitutes a maritime lien. As the court said in Osaka Shosen Kaisha v. Lumber Co., 260 U.S. 490, 499, 43 S.Ct. 172, 174, 67 L.Ed. 364, "The maritime privilege or lien, though adhering to the vessel, is a secret one which may operate to the prejudice of general creditors and purchasers without notice and is therefore stricti juris and cannot be extended by construction, analogy or inference."

Finally, we cannot say that the amount allowed by the Commissioner for maintenance and cure is inadequate. The testimony taken by the Commissioner is not included in the record before us. We must accept the Commissioner's finding that there is nothing further that medical science can do to effect a cure; that the wound "will have to be attended to and his condition checked from time to time, for how long I have no means of determining, but such attention would not seem to be expensive." There is no warrant for a holding by us that the lump sum allowance of $500 for further medical care is inadequate. No authority to which we have been referred goes to the extent of holding that a seaman permanently incapacitated in the service of a ship is entitled to "maintenance" for the rest of his life. Cf. Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993.

The present case calls only for a determination of the seaman's rights in rem, in respect to the fund in the registry of the court representing the proceeds of the sale of the ship. We have no occasion to consider any claims in personam which appellant may have against Pallazolo, the record owner of the vessel, either on account of the oral agreement made by Pallazolo with appellant's parents, or otherwise.

The final decree and order for distribution is affirmed without costs.