**THE CLEVECO.**
**THE ADMIRAL.**
**CLEVELAND TANKERS, Inc., v. SZWED.**
**SAME v. ROCKS.**
**No. 10040.**

Circuit Court of Appeals, Sixth Circuit.
April 2, 1946.

Lee C. Hinslea and Lucian Y. Ray, both of Cleveland, Ohio (Lee C. Hinslea, Robt. G. McCreary, and Lucian Y. Ray, all of Cleveland, Ohio, on the brief; Duncan, Leckie, McCreary, Schlitz & Hinslea, of Cleveland, Ohio, of counsel), for appellant.

Silas Blake Axtell, of New York City (Victor M. Todia and Harry A. Gordon, both of Cleveland, Ohio, and Silas Blake Axtell, of New York City, on the brief), for appellees.

Before MARTIN and McALLISTER, Circuit Judges, and FORD, District Judge.

McALLISTER, Circuit Judge.

On the afternoon of December 1, 1942, the tug Admiral with the barge Cleveco in tow, left her dock at Toledo, outward bound on Lake Erie, for Cleveland. The tug had a crew of thirteen men under the master, Captain Swanson, and the barge, a crew of seventeen, with Captain Smith as master. The barge was loaded with a cargo of fuel oil for delivery at the port of Cleveland. At the time the vessels cleared the harbor, about 2:45 P.M., a light southeasterly wind was blowing. The weather was calm. No storm warnings had been hoisted to indicate any change.

Apparently the voyage was without incident for approximately fourteen hours after departure; but in the early hours of the next day—shortly after 4:00 A.M. on the morning of December 2—Captain Leif Jonassen, the marine superintendent of the Cleveland Tankers, Inc., owner of the vessels, received a ship-to-shore telephone call from Captain Smith on the barge Cleveco.

In this call, Captain Smith reported that the tug had just sunk. He said that when he had last seen her, she was from five to six points up on his starboard bow. He further stated that he could not see any of the crew members of the tug in the water; that there was a high wind and a heavy sea running; and that the thirteen members of the tug's crew, and her captain, were probably lost. He also reported that his tow line was still fast to the sunken tug. In reply to a question from Captain Jonassen as to his position, he replied that he was about two miles off Avon Point. Avon Point is approximately eight miles east of Lorain, Ohio, and about twenty miles west of Cleveland. Captain Jonassen then told

Captain Smith that help would be sent as soon as possible.

Immediately after this conversation, Captain Jonassen called the Coast Guard, notified them of the sinking of the tug, and asked that assistance be sent to the barge, giving its position as Captain Smith had given it. He also called the manager of the Great Lakes Towing Company, informed him of the disaster, and asked him if he could send some tugs out in the lake to try to locate the barge, and was told that they would do their best. Captain Jonassen then prepared to drive from his home in Cleveland out to Avon Point to ascertain whether he could see the barge from the shore. Before he left, the manager of the Towing Company called back on the telephone and advised that two tugs would be sent out in the search, not later than 6:30 A.M.; that one was to go out from Lorain, and the other from Cleveland. On his way to Avon Point, Captain Jonassen stopped at the home of Otto Wanek, the schedule clerk of Cleveland Tankers, and received two telephone calls, one from the commander of the Coast Guard, and the other from the manager of the Towing Company. The commander advised that two Coast Guard surf boats had already been sent out into the lake to look for the barge, and the Towing Company manager stated that the two tugs would be out of their ports without fail by 7:00 A.M.

Captain Jonassen and Wanek then called for the manager of the Towing Company and the three continued on to Avon Point; but after driving around the Point and the various beachheads, and being unable to see anything from the shore, they decided to return to the company's office in Cleveland. Stopping at Wanek's home on the way back, Captain Jonassen placed a radio call to Captain Smith on the barge in order to check again on his position in the lake. He got in touch with him promptly and asked him if he couldn't give a better idea of where he was, telling him that they had been out at Avon Point and hadn't seen any sign of the barge. Captain Smith replied that he had been mistaken in the earlier position given; that he then knew he was not as close to Avon Point as he had reported, but was closer to the course between Southeast Shoal and Cleveland. During this conversation, Captain Smith interrupted to say that he had just seen a tugboat coming up over his stern and asked Captain Jonassen whether he knew any-

thing about it. He was told that it was probably one of the tugs that had been sent out looking for the barge. Captain Smith then wanted to know if this tug had any way of towing and Captain Jonassen replied that they had a heavy hawser aboard, and that they would take the barge in tow. After requesting Captain Smith to inform him of anything that might result in a change of this plan, Captain Jonassen concluded the conversation.

On his return to the company office, Captain Jonassen communicated with the Civilian Air Patrol and arranged to have planes sent out to watch for and keep track of the barge. About 11:30 A.M., he received a call from the Coast Guard commander who wanted more information as to the barge's position. Jonassen assured him that the barge was then probably in tow of one of the tugs that had been sent out; but the commander informed him that he had been in communication with the Ossipee, the steam Coast Guard cutter that had been sent to aid in the search, and that the master of the cutter had reported that he had seen both tugs, but that neither of them had the barge in tow. Captain Jonassen immediately put in another radio telephone call for Captain Smith on the barge and asked him whether he wasn't in tow of the tug. He was surprised to learn from Captain Smith that he was not; that the tug had not come up to him, and had apparently not seen him, although Captain Smith stated that he had seen the tug very plainly. However, he indicated at the time that there was a very heavy Arctic mist on the water, and that that might have been the explanation why the tug missed him. Captain Jonassen then asked if he would give him his position in longitude and latitude in conformity with the request of the Coast Guard commander. Captain Smith complied with this request, but when the position as given was communicated to the Coast Guard, the commander advised that it couldn't be right because it placed the barge too far in shore.

Captain Jonassen thereupon called Captain Smith and asked to be given some landmarks. He was then told that at that moment, the barge was heading due North on the compass; that Captain Smith could see the top of the Terminal Tower in Cleveland and the top of the lighthouse on the main breakwater, over his stern; and that he could observe the smoke from the top of the chimneys of Gordon Park, bearing east-southeast. From these cross bearings, the Coast Guard commander was able to fix the position of the barge.

About 1:00 P.M., Captain Smith called and said that he could hear the airplanes near him; that the wind was picking up, and that it was getting colder. At that time, he had cut adrift from the tug and was laying hove-to with his two anchors out. He reported that the fog was getting worse and that there were intermittent snow squalls.

Shortly before 2:00 P.M., Captain Smith called and said that the Ossipee had sighted him and was working up to the barge; that an attempt would be made to get a hawser over to him so that the Ossipee could take him in tow; and that he would keep Captain Jonassen informed as to his progress. He reported that it was getting very cold, and that there was a violent snow squall then raging, a big sea, and a heavy wind.

About twenty minutes later, Captain Smith called and said that there was so much ice on the deck and over the gear of the barge that he did not think he could take a line and make it fast.

At 3:00 P.M., he called again and reported that the Ossipee had disappeared in the snow squall, and that when she returned, he was going to try to get the crew of the barge aboard the Ossipee, and come in.

Some minutes later, he called again and said that there was a geat deal of ice on the barge, that the wind was augmenting very fast, and the sea rising to great proportions.

A short time after, about 3:30 P.M., he placed another call and advised that he might not be able to communicate on the phone again, because so much water was finding its way to the fireroom; that they might have to put the fires out; and that would cut off the power of the radio-phone generator. He stated that if Captain Jonassen did not hear from him during the night, he would know the reason why. That was the last that was heard from Captain Smith.

After vainly trying to get a call through to Captain Smith that night, Captain Jonassen, on the next day about 7:00 A.M., set out from Cleveland in the tanker, Comet, to search the lake for the barge, Cleveco. With a big sea running and hampered by heavy fog and mist, the Comet, after having been out four hours, sailing to leeward from the last known position of the barge,

came across an oil streak and followed it upwind, until it narrowed down to one point where oil was coming to the surface of the lake. Later, two life boats were recovered, one from the tug Admiral, the other from the barge Cleveco. In the sinking of the Admiral and the Cleveco, thirty-two men lost their lives.

Some time after the disaster, various suits were filed against The Cleveland Tankers, Inc., as owner, to recover for loss of life and damage to property arising out of the sinking of the tug and the barge. Upon the commencement of these suits, petitions were filed by The Cleveland Tankers in the United States District Court for the Northern District of Ohio, Eastern Division, seeking exoneration from, and limitation of, liability, under and by virtue of Title 46 U.S.C.A. §§ 183, 184, and 185, and sections amendatory of, and supplemental thereto.

On the filing of such petitions, and applications for monitions and injunctions, the District Court issued orders, which, in so far as here relevant, provided for issuance of monitions, citing all interested persons to file with a commissioner their proofs of claim and their answers in respect of the matters set forth in the various petitions for exoneration and limitation of liability; and injunctions were forthwith issued, restraining the prosecution of any suits then pending or any proceedings then undertaken, and all future litigation arising out of, or resulting from the sinking of the tug and the barge.

As a consequence of the court's orders, the commissioner reported that claims in the aggregate sum of $1,065,000 were filed as a result of the sinking of the barge Cleveco, and claims aggregating $1,100,000, arising out of the sinking of the tug Admiral.

Pursuant to the action of the court, the parties that had brought the suits for damages, filed answers to the owner's petitions, in which they alleged, among other matters, that the tug Admiral was unseaworthy; that it was unfit for towing service and particularly unfit and unseaworthy for the purpose intended in the voyage which ended with its loss; that the tug was sent to sea by the owner who knew that its stability depended upon the tug's maintaining its tow line in a fore and aft position and that the owner knew that a change in such position of the tow line would cause the tug to capsize; and that the loss of life resulting from the sinking of the tug and the barge resulted from the negligence of the owner in furnishing an unstable and unseaworthy vessel. Concluding their answers, claimants asked the court to dismiss the petitions for exoneration, and limitation of liability.

On the hearing of the petitions and answers, the principal questions for determination before the District Court were: whether the tug, Admiral, was seaworthy; whether, if it was not seaworthy, the owner had knowledge thereof; whether, if it did not have such knowledge, it had means of knowledge of that fact and was negligent in not availing itself of such knowledge; and whether the loss of the tug and the barge was caused by the unseaworthiness of the tug.

The trial court found, as facts, that the tug, Admiral, was unseaworthy; that the owner had knowledge of that fact, and was negligent in not furnishing a seaworthy ship; and that the loss of the tug and the barge was caused by the unseaworthiness of the tug. The petitions for exoneration from, and limitation of liability, were, accordingly, dismissed.

Appellant contends that the tug was stable and seaworthy; that her loss was due to the perils of the sea; and that even though she had been unseaworthy, appellant had no knowledge or privity of that fact, but had used due care to furnish a seaworthy vessel and was, therefore, in no way negligent.

The chief questions presented on this appeal for our determination are whether the tug, Admiral, was seaworthy, and, if she was unseaworthy, whether the owner had knowledge or privity of that fact.

We address ourselves, then, first, to the question of the stability and seaworthiness of the tug, Admiral, having in mind that an appeal in Admiralty is a trial de novo, but that the findings of the District Court will be accepted unless clearly against the preponderance of the evidence. The Secandbee, 6 Cir., 102 F.2d 577; City of Cleveland v. McIver, 6 Cir., 109 F.2d 69.

In considering the evidence with respect to the stability of the Admiral, some brief account of her history, use, and construction, and the government inspections to which she was subjected, is pertinent.

The Admiral, of 130 gross tons, 86 feet in length at waterline, drawing 12½ feet, with a 22 foot beam, was formerly the steam tug, W. H. Meyer, which was built

at Manitowoc, Wisconsin, in 1922. She was purchased from her former owner by appellant, Cleveland Tankers, Inc., about April, 1942, for the purpose of towing the barge, Cleveco, which the company had acquired some time before. In order to use the tug for towing the barge, it was necessary to make changes in her superstructure and quarters to comply with the three-watch system and carry a crew of thirteen men. Plans were accordingly prepared outlining the work proposed to be done and these were submitted to the United States Steamboat Inspection Service, and approved by it.

These plans provided for cutting away the wheelhouse and moving it forward, and at the same time, raising it to make room for additional quarters; adding a shower and washroom; reconstructing the messroom; installing new refrigerating equipment; raising the smoke stack; and providing new life rafts and other equipment. To carry out these alterations, the tug was put into dry dock in the yards of J. A. Hendrickson Company and the repairs were then made, with the result that the superstructure of the vessel was lifted, her center of gravity raised, and approximately 10 tons of weight added to her hull, at an average height of eighteen feet, six inches above her keel. During the reconstruction, government inspectors, representatives of Lloyds' Registry, and officials of Cleveland Tankers were in periodic attendance.

After the repairs had been substantially completed, Captain Thomas W. Gould, Merchant Marine Inspector of the Merchant Marine Inspection Bureau at Cleveland, suggested that there should be a stability test of the tug, and as a result of his advice, such a test was subsequently made on July 21, 1942, under the supervision of James B. Robertson, Jr., Naval Architect, from the Washington headquarters of the United States Coast Guard. On July 23, 1942, a temporary certificate was issued by the Coast Guard, stating that a preliminary examination of the data from the stability test conducted on the tug Admiral indicated that the vessel had satisfactory stability; that when final stability calculations were made, a stability letter, to be posted on board the vessel, would be issued; and that until such time, it would be satisfactory for the vessel to operate in normal service. On September 11, 1942, a further letter was issued by the Coast Guard setting forth that the calculations based upon the results of the stability test indicated that the tug "has satisfactory stability for all reasonable operating conditions on the waters indicated in the Certificate of Inspection, subject to the following restrictions:

"(1) Vessels shall not be operated at a mean keel draft in excess of 11' 0" or at more than 2' 3" trim by the stern when at this draft.

"(2) Bilges shall be maintained well pumped out.

"(3) Tow line shall be maintained in as nearly a fore and aft line as practicable.

"This stability letter is to be framed under glass and posted in the pilothouse of the subject vessel."

The tug, Admiral, was put into service by Cleveland Tankers the day after receipt of the temporary certificate issued July 23, 1942, and continued to operate from that date until she was lost on December 2, 1942.

As far as the record evidence above related goes, it would seem to favor inferences to be drawn that the tug had stability and was seaworthy. However, the official record of the Admiral's stability test was on file in Washington, D. C. This official record set forth in a paragraph preceding the three restrictions (which were mentioned in the letter issued to the owner by the Coast Guard) that:

"Examination of the foregoing data indicates that *the subject vessel is slightly deficient in stability* and the following restrictions should be observed in the operation thereof:" (Emphasis supplied.)

Much of the controversy between the parties is concerned with the official record of the stability test, principally, however, because of the claim on the part of Cleveland Tankers, that it had no knowledge of the conclusion reached by the Coast Guard that the vessel was "slightly deficient in stability." But the discussion of that question is reserved for our subsequent consideration. Here, it is mentioned only as indicating that the tug actually was deficient in stability.

Furthermore, expert testimony strongly supported the trial court's conclusion that the Admiral was unstable. Henry B. Adams, Associate Professor of Naval Architecture and Marine Engineering, at the University of Michigan, testified from the calculations made in the official stability

test of the Admiral. Professor Adams appears to be exceptionally qualified as an expert on maritime matters. He himself supervised the stability tests on the Leviathan, the New York, the Finland, the Mongolia, the Manchuria, and many other ocean-going vessels. He was Technical Aide to the committee which sets up the standards, for the Government Steamboat Inspection Service, that were employed to determine the stability of the very vessel in this case. The testimony of Professor Adams was to the effect that the metacentric height of the Admiral, as shown in the stability test, was entirely inadequate for a vessel of that type; that such inadequacy rendered the tug topheavy and unseaworthy; and that the lack of stability, shown in the report of the test was a factor contributing to the sinking of the vessel. In addition, Professor Adams testified that the third restriction contained in the letter issued by the Coast Guard to the owner of the tug—that the "tow line shall be maintained in as nearly a fore and aft line as practicable"—practically voided the Certificate of Stability, and that it put the owner very definitely on warning that the Admiral was "a dangerous vessel, a vessel to be handled with kid gloves in the utmost care."

We are mindful of the contentions of counsel for appellant that Professor Adams' conclusions—that the tug's metacentric height was so insufficient that she was unstable even though she abided by the restrictions—were based upon various misconceptions and assumptions on his part. But we do not find such arguments persuasive that Professor Adams was wrong in his conclusions that the tug was unseaworthy. For counsel for appellant conceded that "if such language" contained in the official stability test—that the data indicated that *the subject vessel is slightly deficient in stability*—"had come to appellant's attention, as contrasted with the statement that the tug had satisfactory stability, there would have existed the obligation on the appellant's part, we freely concede, to have taken further steps to rectify any defects which the Coast Guard had found, or alternatively, to lay the vessel up." This would seem sufficient, in itself, to warrant a determination on our part that there was ample evidence to sustain the trial court's finding that the Admiral was deficient in stability and unseaworthy. But, because our decision on other issues in the case is somewhat concerned with certain additional proofs of instability of the tug, we proceed to recount briefly some other items of evidence along these lines.

With regard to the tug's stability in actual operation on the Lakes, certain testimony given by former crew members is illuminating. These witnesses stated that some time before the disaster while coming down the Detroit River, the captain of the tug, upon being told that coal was needed, "cut directly towards the Canadian side" of the river, without releasing the barge. When the hawser used for towing the barge "picked up the strain from the side, the tug started to tip over." All the crew members that were sleeping in their bunks were rolled out and came rushing up on deck in their underwear. The mate started to hack at the hawser with an axe, as the vessel began to tip over. Finally, a fireman on watch was able to drive a bolt out of an attachment on the towing device on the tug, releasing the hawser cable, just as the water started to come over the top of the starboard rail, which appears to have been about two feet above the deck. When the hawser cable was released, "the cable swung about 30 or 40 feet before she touched the water with the strain that was on her. It looked pretty bad there for a few moments. In fact she rolled all the fellows out of their bunks that were sleeping forward there. * * * We knew something was wrong at the angle the tug was," one of the crew testified, "and we all about the same time we was all getting to the stairway to run up, when the fireman on the watch hollered down below, he hollered 'Come on up' in such a voice that we knew something was wrong. * * * We knew we were in the river, there wasn't no sea, nothing should make the tug tip but * * * the tug started to tip over."

As further evidence that the tug was unseaworthy, appellees allude to the fact that, when the alterations were completed after the tug had been purchased by the Cleveland Tankers, the pilothouse was so constructed that the wheelsman was unable to see astern, and was unable to watch the tow without either leaving the steering wheel and opening one of the doors to look aft, or leaving the wheel and mounting a bench in order to look through a window which was placed too high above the deck to permit of observation otherwise. Captain Jonassen, appellant's superintendent, conceded that it was important to a man who was towing something that he be able to see

what he was towing. The shipbuilder who had performed the construction work in question stated that he had never heard of any other tug anywhere that had been built in such a way that a pilot had to leave his wheel, walk back, and step on a bench, in order to see anything behind him. Captain Gilbey, a master of tugs for upwards of fifty years, gave as his opinion that a tug whose aft pilothouse windows were so placed that the helmsman could not see his tow or tow line without leaving the wheel, was unseaworthy. Considered in connection with the third restriction in the certificate from the Coast Guard—that the tug's stability for operations on the Lakes depended, among other conditions, upon the tow line's being maintained in as nearly a fore and aft position as practicable—and in the light of Professor Adams' testimony that this restriction practically voided the Certificate of Stability because of the virtual impossibility of conforming thereto, and put the owner on notice that the Admiral was a dangerous vessel to be operated with the utmost care, the foregoing evidence is indeed persuasive that the placing in commission of a vessel so built that the helmsman could not see the tow line without leaving the wheel to look through a door or window as above described, constituted negligence in furnishing an unseaworthy vessel.

Moreover, it appears that in the conversation by the ship-to-shore telephone between Captain Jonassen, the marine superintendent of appellant, and Captain Smith, of the barge, which took place about 4:00 o'clock in the morning of the day of the disaster, Captain Smith reported that the Admiral was "about 5 points up on his bow," and that the Cleveco was having trouble with the steering gear and, so, had "sheered off." Five points amount to more than 56°. In the ship-to-shore telephone conversation, Captain Jonassen asked Captain Smith if he couldn't "do something to take the strain off the hawser," and Captain Smith's reply was: "Captain, I was running over there and had hold of the lever to release it, and I looked around and it was gone." The tug had suddenly sunk before Captain Smith had been able to pay out the cable. The reasonable inferences to be drawn from the above testimony are that the towing hawser, instead of being in a fore and aft position on the Admiral, was leading over her port quarter at an angle of 56°, and was such a strain pulling over

one side of the tug, that both Captain Jonassen and Captain Smith were struck with the fact that the Admiral was in immediate peril and that the chief hope for safety lay in relieving the strain on the hawser. If such were the case, it can only be concluded that the strain had grown so great that the idea of releasing the hawser came too late.

In the consideration of the above matters, it is also to be remembered that the trial court found that when the tug went down, the weather and seas were such as might reasonably be expected on the Great Lakes during that time of year. We shall have occasion to consider such finding somewhat more extensively in connection with another issue in the case, but here mention it for such inferences as may be drawn therefrom as to the tug's stability.

These various items of evidence as to the tug's instability and unseaworthiness—the official record of the stability test that the Admiral was slightly deficient in stability and that its operation was subject to limitation that its tow line should be maintained in as nearly a fore and aft line as practicable; the fact that the pilothouse was so constructed that the helmsman could not see the tow line or barge without leaving his wheel and opening a door or mounting a bench to look through a high window, and so was obstructed in keeping the tow line in as nearly a fore and aft line as possible; the testimony of Professor Adams that the metacentric height of the tug was entirely inadequate and resulted in the vessel's being topheavy, unstable, and unseaworthy, and that the restriction concerning the tow line virtually voided the Certificate of Stability and placed the owner on warning that the Admiral was a dangerous vessel to be operated with the utmost care; the evidence that the tug almost capsized in the Detroit River in calm waters; the testimony of Captain Gilbey that the tug was not seaworthy; and the evidence that at the time the tug sank there was a tremendous strain on the hawser, that the barge was pulling over at one side at an angle of 56°, and that the sinking occurred before the hawser could be released by the barge captain—all of the evidence of these circumstances, taken in connection with the trial court's conclusion that, at the time of the sinking of the Admiral, the seas and weather were such as might be reasonably expected—amply supported the District Court's finding that the tug was unseaworthy at the time of the disaster; and

pursuant to the rule of law heretofore announced, that the findings of the District Court in appeals in Admiralty will be accepted unless clearly against the preponderance of the evidence, we, accordingly, sustain and adopt the trial court's finding that the Admiral was unseaworthy at the time it sank.

 We come then to consideration of the question whether appellant had knowledge of the fact that the Admiral was unseaworthy, as liability, in these cases, may be limited only where the loss was incurred without the privity or knowledge of the owner of the vessel. Title 46 U.S.C.A. § 183. Where a corporation is the owner of a vessel, the knowledge of the marine superintendent having general control and direction of its business is the knowledge of the corporate owner of the vessel. Eastern S. S. Corporation v. Great Lakes Dredge and Dock Co., 1 Cir., 256 F. 497; and, within the section of the statute limiting liability knowledge means not only personal cognizance but also the means of knowledge—of which the owner or his superintendent is bound to avail himself—of contemplated loss or condition likely to produce or contribute to loss, unless appropriate means are adopted to prevent it. See The Chickie, D.C.Pa., 54 F.Supp. 19; The Mattie, D.C.N.Y., 38 F.Supp. 745, affirmed Jacobus Granwiller Co. v. Reichert, 2 Cir., 136 F.2d 904; Petition of Liebler, D.C. N.Y., 19 F.Supp. 829.

Referring to the evidence on the subject of knowledge or means of knowledge on the part of the owner or his superintendent, again, the testimony of Professor Adams, on this phase of the case, is especially pertinent, that the certificate issued by the Coast Guard to the owner of the Admiral—stating that the tug had satisfactory stability for all reasonable operating conditions "subject to the following restrictions: * * * Tow line shall be maintained in as nearly a fore and aft line as practicable"—was virtually voided by this restriction; and that such restriction put the owner definitely on warning that the Admiral was a dangerous vessel to be handled with the utmost care. Here also is to be recalled the expert testimony of Captain Gilbey, that in his opinion it was important "to the tug, her crew, and her chances to survive a storm that the pilot be able to see his tow," as well as the testimony on cross examination of appellant's marine superintendent that he thought it was important to a man who was towing something to be able to see what he was towing. Having in mind the Coast Guard's restriction as to the tow line, the knowledge on the part of appellant's marine superintendent that it was important for the pilot to see the barge that he was towing, the expert opinion of Professor Adams that the restriction as to the tow line virtually voided the certificate because of the impossibility of conforming to it in actual operation, and his view that it put the owner upon notice that it owned a dangerous vessel, we come to the evidence of the construction of the pilothouse on the tug.

Here was an arrangement whereby the pilot was unable to see what he was towing without leaving the helm and opening a door aft, or mounting a bench and looking through a window that was too high to see through from a standing position on the floor of the pilothouse. Considered in connection with the restriction of keeping the tow line in a fore and aft position, the conceded importance of seeing the barge while towing it in order to conform to such restriction, the fact that the tug's stability in operation depended upon conforming to the restriction, the difficulty in ordinary circumstances of towing a barge and at the same time obeying the limitation as to the tow line, and the added obstruction to vision of the doors and high windows in the pilothouse which made it impossible for the pilot to keep his eye on the tow line at all times, thus preventing him from keeping the tow line in as nearly a fore and aft line as practicable, this evidence would seem further to support the expert opinion of Captain Gilbey that the Admiral was unseaworthy, and the view of Professor Adams that the certificate issued by the Coast Guard was practically voided by the restriction as to the tow line, and placed the owner of the tug on notice that the Admiral was dangerous and to be operated with the utmost care. Moreover, on this subject, it is to be remembered that the first remedy suggested by Captain Jonassen, when he was told by the barge captain in the ship-to-shore telephone conversation about the Admiral's having been five points up on his bow, was to do something to take the strain off the hawser; and that he subsequently testified in the hearing conducted by the Coast Guard that he was of the opinion that, as the tug continued on her course at the time that the barge took the sheer, the cable tow line, weighing about 3½ pounds to the foot, pulling at an angle

to the barge, would be a very heavy weight in that kind of sea, and that he thought that that had contributed to the tug's sinking.

We have commented upon the foregoing as establishing that there was knowledge or means of knowledge on the part of the owner or its superintendent of conditions that were likely to violate the restrictions in the certificate issued by the Coast Guard, and so imperil the safety of the tug—or, in other words, knowledge or the means of knowledge of the fact of the tug's instability or unseaworthiness.

However, failure to make a ship seaworthy in respect of a matter as important to the members of the crew as its stability is prima facie evidence of negligence. Sabine Towing Co. v. Brennan, 5 Cir., 72 F.2d 490. In a case of this nature, the foregoing rule amounts to the same thing as the holding of the courts that the burden is upon an owner, seeking limitation of liability under the statute, to prove lack of knowledge or of the means of knowledge on his part or that of his marine superintendent that his vessel was unseaworthy. The E. Madison Hall, 4 Cir., 140 F.2d 589, certiorari denied W. E. Valliant Co. v. Rayomier, Inc., 322 U.S. 748, 64 S.Ct. 1159, 88 L.Ed. 1579; The Marguerite, 7 Cir., 140 F.2d 491; The Silver Palm, 9 Cir., 94 F.2d 776; Henson v. Fidelity & Columbia Trust Co., 6 Cir., 68 F.2d 144; In re Eastern Transportation Co., D.C.Md., 37 F.2d 355, modified The Calvert, 4 Cir., 51 F.2d 494. In order to prevail, therefore, it is not necessary for appellees to prove knowledge or means of knowledge on the part of appellant that the tug was unseaworthy.

From a consideration of the evidence, it is our conclusion that not only did appellant fail to sustain the burden of proof that it lacked knowledge of the fact that the Admiral was unseaworthy, but it further appears that the evidence supports the conclusion that the owner should have known that the tug was not seaworthy at the time it sank; that the loss, as the trial court found, was due to the negligence of the owner in failing to use due care in furnishing the crew members with a seaworthy vessel for the voyage undertaken; and that its dispatch of the vessel on this particular voyage at that time of year, considering the lack of stability of the tug Admiral, and the difficulty, if not impossibility, of navigating her in accordance with the prescribed restrictions, was productive of the injuries and damages, and was such negligence as

rendered the owner liable for the loss sustained.

This brings us to the consideration of one of appellant's contentions in which it most vigorously attacks the trial court's conclusion that appellant had knowledge of the tug's lack of stability. The District Court found that the full report of the findings and calculations of the stability test conducted by the Coast Guard "were delivered to responsible officials of Cleveland Tankers, Inc., including the following:

"'Examination of the foregoing data indicates that the subject vessel is slightly deficient in stability and the following restrictions should be observed in the operation thereof: * * *'"

Appellant declares that there is no proof whatever that the findings and calculations of the stability test were ever delivered to it or its officials or to its marine superintendent, Jonassen, and that appellant did not, prior to the disaster, receive any communication from the Coast Guard or anyone else advising that the Admiral was slightly deficient in stability, but on the contrary, received only the two communications from the Coast Guard following the inclination test, advising that the tug had satisfactory stability if operated according to the stated restrictions. Appellees assert, in reply to the foregoing, that appellant sought the Certificate of Stability in order to put the tug to use; that it evidently had notice of the fact that the report of the government agency whom they requested to perform the service would be probably recorded in the Office of the U. S. Coast Guard at Washington, accessible to it as well as to others; and that all persons interested in transactions made pursuant to a public statute are chargeable with notice of all that the law contains. Both parties in their briefs cite the following Coast Guard Regulations (Great Lakes: General Rules and Regulations Section 83.15):

"*Inclining Tests.* When inspectors have any reason to question the stability of any vessel under their jurisdiction, they shall require the owners of the vessel to make inclining tests on such vessel, under the supervision of the Commandant.

\* \* \* \* \* \*

"The Officer in Charge, Marine Inspection, shall place a notation in regard to the inclining data on the upper right hand corner of the certificate of inspection of every vessel subject to this section, to read as follows: Data relating to the stability of this

vessel is on file at Coast Guard Headquarters, Washington, D. C."

It is not clear what this citation of regulations has to do with the particular issue here before us, except that it might possibly be taken, under the circumstances, as evidence that appellant knew that the data of the stability test was on file at Washington.

Whatever inferences may be drawn from this fact, and whatever importance may attach to the appellees' contention with respect to the claim of the owner that it had no notice of the report that the tug was slightly deficient in stability, we are of the view that it will clarify discussion of this disputed point if appellant's claim be conceded, and if it be assumed that the full report of the stability test was not delivered to the responsible officials of the owner—and that, accordingly, it had no notice or knowledge that such report had stated that the tug was slightly deficient in stability.

■ On an appeal in Admiralty, we accept the findings of the trial court unless they are clearly against the preponderance of the evidence. When a finding is clearly against the preponderance of the evidence, that fact does not call for reversal, as, in such a case, since an Admiralty appeal is a trial de novo, we are called upon to determine, ourselves, whether a party has established his case by a preponderance of the evidence. As has been already indicated, we are of the opinion—without taking into consideration the evidence of the complete report of the stability test, of which appellant claims it had no knowledge—that the proofs nevertheless amply sustain the conclusion that the owner had knowledge or the means of knowledge of the fact of the tug's instability at the time of the sinking. It would, therefore, make no difference whether the trial court had been under a misapprehension in its finding that the owner had notice of the language in the Coast Guard report that the tug was "slightly deficient in stability." For it was not necessary to find that such notice of instability had been received by appellant, and, under the circumstances, of this case, the finding would, in no event, constitute reversible error.

■ Appellant contends that the "peril of the sea" was responsible for the sinking of the tug and the barge. Peril of the sea is something "so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety." The Rosalia, 2 Cir., 264 F. 285, 288; and storms relied upon to explain the loss of a vessel in rebuttal of a claim of unseaworthiness must be shown to have been of extraordinary intensity. Sabine Towing Co. v. Brennan, supra.

■ The evidence was that when the tug sank, the weather was not unusual for that time of year. Captain Jonassen understood from Captain Smith in the ship-to-shore conversation after the tug had gone down that "there was a large sea, but nothing out of the ordinary," and Captain Smith further expressed no fear for the lives of the men on board the Cleveco. When he was asked whether the members of the crew wished to come off the barge, he replied that neither he nor any of the men wanted to leave the ship or thought it necessary. After the weather had become much worse, two other tugs went out on the lake in the vicinity of the barge and continued searching for her for several hours. The trial court's conclusion that the weather did not reach extraordinary proportions until after the tug went down, and that the loss did not result from the peril of the sea, is amply supported by the proofs in the case, and is accordingly sustained and adopted.

■ That the sinking of the tug resulted from the fact that she was unstable and unseaworthy would naturally follow from findings that she was unseaworthy and that she was not lost as a result of the peril of the sea. Here, it may be said that the tug sank from unknown causes, under circumstances where nothing but unseaworthiness could explain the disaster. The Transit, 3 Cir., 250 F. 71. She had previously almost capsized in the Detroit River because of the strain of the hawser over her side pulling on an angle to the barge. When Captain Smith last saw the tug before she went down, she was proceeding at an angle of 56° from the barge, with a tremendous strain on the hawser. She sank suddenly just as Captain Smith was about to release the strain. Her stability, admittedly, depended upon the hawser being maintained in as nearly a fore and aft line as possible. The inferences and conclusions of the trial court that the sinking of the tug resulted from her lack of stability and the fact that she was unseaworthy, were reasonably and properly drawn, and are amply sustained by the evidence.

With regard to liability for the loss of the barge, the trial court found that the tug and barge were a single unit, a flotilla, and properly considered as one vessel for the purpose of the voyage; that except for the unseaworthiness of the tug, the barge could have reached safety of her port of destination, and that the liability of the shipowner to respond in damages for the loss of life in the sinking of the tug, carried with it a like liability for the loss of life resulting from the sinking of the barge. While error was assigned on this finding, the proposition was not discussed in the briefs of counsel nor argued on the hearing; and it is, accordingly, sustained.

In consideration of the foregoing, the decision of the District Court denying appellant's petitions for limitation of, and exoneration from liability, and decreeing that the damage claimants recover from appellant, is affirmed.